UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CR 25.66 NEB/DJF

| | |
|---|---|
| UNITED STATES OF AMERICA, | **INDICTMENT** |
| | |
| | 18 U.S.C. § 2 |
| | 18 U.S.C. § 371 |
| Plaintiff, | 18 U.S.C. § 554 |
| | 18 U.S.C. §§ 981-982 |
| v. | 21 U.S.C. § 853 |
| | 28 U.S.C. § 2461(c) |
| | 50 U.S.C. § 4819 |
| 1. MOHAMMAD JAWAID AZIZ, | 50 U.S.C. §§ 1701-1708 |
| a/k/a "Jawaid Aziz Siddiqui", | |
| a/k/a "Jay Siddiqui", | |
| ▋▋▋▋▋▋▋▋▋▋ | |
| ▋▋▋▋▋ | |
| Defendants. | |

THE UNITED STATES GRAND JURY CHARGES THAT:

## COUNT 1
[18 U.S.C. § 371 – Conspiracy]

### Introduction

At all times relevant to this Indictment:

1.    As more fully described in the allegations of this indictment, the

defendants

**MOHAMMAD JAWAID AZIZ,**
**a/k/a "Jawaid Aziz Siddiqui",**
**a/k/a "Jay Siddiqui",**

▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋

SCANNED
FEB 2 5 2025
U.S. DISTRICT COURT MPLS

*United States v. Mohammad Jawaid Aziz, et al.*

along with co-conspirators known and unknown to the grand jury, engaged in a yearslong conspiracy to operate a global procurement network designed to evade U.S. export controls to acquire U.S.-origin goods for unauthorized export to prohibited organizations in Pakistan that were designated on the U.S. Department of Commerce's Entity List due to their association with Pakistan's military and weapons complex.

## Legal Framework

2.      The President of the United States is empowered to issue executive orders that have the full force and effect of law.

3.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1708, granted the President the authority to declare a national emergency to address unusual and extraordinary threats to the national security, foreign policy, and economy of the United States.

4.      Pursuant to IEEPA, on August 17, 2001, the President issued Executive Order 13,222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001. While in effect, the EAA regulated the export of goods, technology, and software from the United States. Pursuant to the EAA, the Department of Commerce's ("DOC") Bureau of Industry and Security ("BIS") promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774, which contained restrictions on the export of goods outside of the United States, consistent with the EAA. In Executive Order 13,222, pursuant to

2

*United States v. Mohammad Jawaid Aziz, et al.*

IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13,222 from the time period covered by that Executive Order through at least August 13, 2018.

5.    On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which included provisions on export controls. Those provisions composed the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. §§ 4801 et seq. In part, ECRA provides permanent statutory authority for the EAR. For conduct that predates August 13, 2018, IEEPA is the controlling statute. For conduct occurring after August 13, 2018, ECRA is the controlling statute.

6.    Pursuant to IEEPA and ECRA, the DOC reviewed and controlled the export of certain goods and technologies from the United States to foreign destinations. In particular, the DOC placed restrictions on the export of goods and technologies that it determined could make a significant contribution to military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.

7.    Through the EAR, DOC imposed license or other requirements before an item (i.e., commodities, software, or technology) subject to the EAR could be lawfully exported from the United States or lawfully re-exported from another country. "EAR99" is a classification for items subject to the EAR, but not subject to certain expanded export controls by the U.S. Government. More sensitive items subject to the expanded controls were enumerated on the Commerce Control List ("CCL") and assigned Export Control Classification Number ("ECCN").

*United States v. Mohammad Jawaid Aziz, et al.*

8.      In addition, the EAR contained a list of names of certain foreign persons – including businesses, research institutions, government and private organizations, individuals, and other types of legal persons – that were subject to specific license requirements for the export, re-export, and/or in-country transfer of specified items. These persons comprised BIS's "Entity List," located at Title 15, Code of Federal Regulations, Part 744, Supplement No. 4.  Grounds for inclusion on the Entity List included activities sanctioned by the U.S. State Department and activities contrary to U.S. national security or foreign policy interests.  The persons on the Entity List were subject to export licensing requirements and policies supplemental to those found elsewhere in the EAR.

9.      Pursuant to Section 1705(a) of IEEPA, "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and pursuant to Section 1705(c), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section" shall be guilty of a crime.  Section 4819 of ECRA contains similar provisions.  Willful violations of the EAR constitute criminal offenses under IEEPA and ECRA.

**Restricted Entities Associated with Weapons Development in Pakistan**

10.     Since Pakistan first tested a nuclear explosive device 1998, the DOC has imposed restrictions on the export of dual-use U.S.-origin goods to certain organizations associated with the development of sensitive military technology in Pakistan, including nuclear weapons, missiles, and unmanned aerial vehicles

4

*United States v. Mohammad Jawaid Aziz, et al.*

(UAVs).  At various times, the DOC has added such organizations to the Entity List, including front companies those organizations created to circumvent the U.S. export restrictions.  Exports, re-exports, and in-country transfers of all items subject to the EAR—including items on the Commerce Control List and items classified as EAR99—to organizations on the Entity List required a license from BIS.

11.    On November 19, 1998, DOC added several Pakistani government, parastatal, and private entities determined to be involved in nuclear or missile activities to the Entity List.

12.    Since November 19, 1998, the Pakistan Atomic Energy Commission ("PAEC") of Islamabad, Pakistan, has been on the Entity List.  The Entity List names entities associated with PAEC to include "subordinate entity Nuclear reactors (including power plants), fuel reprocessing and enrichment facilities, all uranium processing, conversation and enrichment facilities, heavy water production facilities and any collocated ammonia plants."

13.    PAEC used Progressive Business Enterprises Pvt Ltd as a front company to procure U.S.-origin goods without a license from BIS in contravention of U.S. sanctions.  Progressive Business Enterprises was not on the Entity List.

14.    Since November 19, 1998, the Defense Science and Technology Organization ("DESTO") of Rawalpindi, Pakistan, has been on the Entity List.

15.    Since November 19, 1998, Abdul Qader Khan Research Laboratories has been on the Entity List.  Abdul Qader Khan Research Laboratories was also known, among other names, as Khan Research Laboratories ("KRL").

16.    Since November 19, 1998, the Space and Upper Atmospheric Research

5

*United States v. Mohammad Jawaid Aziz, et al.*

Commission ("SUPARCO") of Karachi, Pakistan, has been on the Entity List.

17.     Since October 1, 2001, Pakistan's National Development Complex ("NDC") has been on the Entity List.

18.     NDC used at least the following front companies to procure U.S.-origin goods without a license from BIS in contravention of U.S. sanctions: (1) Global Communications Enterprises, (2) SkyTech Corporation, (3) and United Construction Co.  None of those three front companies was on the Entity List.

19.     Since September 18, 2014, Pakistan's Advanced Engineering Research Organization ("AERO") has been on the Entity List.   The End-User Review Committee ("ERC") found that AERO's "involvement in the procurement of sensitive U.S. technology in support of Pakistan's development of its missile and strategic unmanned aerial vehicle (UAV) programs" was in violation of the EAR, which required a license to export, reexport or transfer (in-country) any item subject to the EAR that the exporter, reexporter, or in-country transferor knows will be used in the design, development, production or use of rocket systems by Pakistan.  The ERC stated that AERO had "used intermediaries and front companies to procure U.S.-origin items by disguising the end-uses and end-users of the items from U.S. exporters thereby circumventing BIS licensing requirements," and that AERO had "procured items on behalf of Pakistan's Air Weapons Complex ('AWC'), a Pakistani government entity responsible for Pakistan's cruise missile and strategic UAV programs."

20.     Pakistan's AWC has been on the Entity List since December 15, 2016.

21.     AERO used Integrated Solutions as a front company to procure U.S.-

*United States v. Mohammad Jawaid Aziz, et al.*

origin goods without a license from BIS in contravention of U.S. sanctions. Integrated Solutions has been on the Entity list since January 26, 2018.

22.    Since December 15, 2016, New Auto Engineering of Rawalpindi, Pakistan, has been on the Entity List.

23.    New Auto Engineering used Global Traders as a front company to procure U.S.-origin goods without a license from BIS in contravention of U.S. export restrictions. Global Traders was not on the Entity List.

24.    Since December 15, 2016, Pakistan's National Engineering and Scientific Commission ("NESCOM") has been on the Entity List.

### Individuals, Companies, and Email Addresses

25.    Defendant MOHAMMAD JAWAID AZIZ, a.k.a. JAY SIDDIQUI, a.k.a. Jawaid Aziz Siddiqui, a.k.a. Jay Siddiqui ("SIDDIQUI") is citizen of Pakistan and Canada who resides in Canada.

26.    ███████████████████████████████████████████████████████████
███████████████████████████████.

27.    ███████████████████████████████████████████████████████████
███████████████████████████████████

28.    Diversified Technology Services was a company located at 16779, 84A Avenue in Surrey, British Columbia, Canada, which was also SIDDIQUI's residence. SIDDIQUI owned and operated Diversified Technology Services.

29.    International Trading Company was a company located at Suite 401, Al-Amin Tower, E-2, Block-10 Gulshan-e-Eqbal in Karachi, Pakistan. The defendants and their co-conspirators used International Trading Company as part of the

7

*United States v. Mohammad Jawaid Aziz, et al.*

conspiracy to procure U.S.-origin goods for prohibited entities in Pakistan without a license from BIS.

30.    Industrial Automation was a company located in Karachi, Pakistan at the same address as International Trading Company.    The defendants used Industrial Automation as part of the conspiracy to procure U.S.-origin goods for prohibited entities in Pakistan without a license from BIS.

31.    Skytech Engineering Ltd was a company located in Pakistan.    The defendants used Skytech Engineering as part of the conspiracy to procure U.S.-origin goods for prohibited entities in Pakistan without a license from BIS.

32.    Co-Conspirator 1 was a citizen of Pakistan who resided in Pakistan.  Co-Conspirator 1 worked for International Trading Company and a sister company, primarily to coordinate the receiving and transferring of shipments within Pakistan.

33.    Co-Conspirator 2 was a citizen of Pakistan who resided in Pakistan.  Co-Conspirator 2 held himself out as an owner and partner of International Trading Company.

34.    The co-conspirators used several email addresses to further the conspiracy and to facilitate communications among one another, with prohibited entities in Pakistan, and with providers of U.S.-origin goods. The co-conspirators frequently shared access to the email accounts to facilitate the sharing of information and responsibilities. Those email addresses included: (1) i_t_company@yahoo.com registered to "Mahmood Ali"; (2) indautomation@yahoo.com, registered to the name "Jamal    Kahn";    (3)    mjawaidaziz@yahoo.ca;    (4)                         ;    (5)
                                          ;    (6)                                          ;    (7)

*United States v. Mohammad Jawaid Aziz, et al.*

██████████████████ ; and (8) ██████████████████ .

### The Conspiracy

35.    Beginning as early as 2003 and continuing through in or around March

2019, in the District of Minnesota and elsewhere, the defendants:

**MOHAMMAD JAWAID AZIZ,**
**a/k/a "Jawaid Aziz Siddiqui",**
**a/k/a "Jay Siddiqui",**

████████████████████████████

████████████

did willfully conspire with Co-Conspirator 1, Co-Conspirator 2, and other persons

known and unknown to the Grand Jury to commit the following offenses against the

United States:

(a)    To willfully export and cause to be exported goods from the United

States to entities in Pakistan that were designated on the Department of

Commerce's Entity List without first having obtained the required licenses

from the Department of Commerce, in violation of 50 United States Code

Section 4819(a) and (b) and in violation of 50 United States Code  Section

1705(a) and (c), and Title 15, Code of Federal Regulations, Section 764.2.

(b)    To willfully engage in transactions and to take actions with the

intent to evade the EAR and orders, licenses, and authorizations issued

thereunder, in violation of 50 United States Code Section 4819(a) and (b) and

in violation of 50 United States Code Section 1705(a) and (c), and Title 15, Code

of Federal Regulations, Section 764.2.

*United States v. Mohammad Jawaid Aziz, et al.*

   (c)  To fraudulently and knowingly export and send and attempt to export and send from the United States, merchandise, articles, and objects contrary to laws and regulations of the United States, and receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such merchandise, articles, and objects prior to exportation, knowing the same to be intended to exportation contrary to laws and regulations of the United States, in violation of Title 18, United States Code, Section 554.

   (d)  To defraud the Department of Commerce by impairing, impeding, interfering with and obstructing, through deceit, craft, trickery, and dishonest means, a lawful government function, that is, the enforcement of export laws and regulations, and the issuance of licenses relating to the export of goods from the United States, in violation of 18 U.S.C. § 371.

### Manner and Means of the Conspiracy

  36.  It was part of the manner and means of the conspiracy that International Trading Company would receive and process requests for quotes and purchase orders from organizations in Pakistan on the Entity List or those organizations' front companies.      often performed that work for International Trading Company in his capacity as a Sales Executive.

  37.  Through Diversified Technology Services, along with other businesses he used for similar purposes, SIDDIQUI would approach U.S. companies about procuring the goods requested by the restricted Pakistani entities through International Trading Company. Upon receiving pricing information from the U.S. companies, the co-conspirators would submit quotes to the restricted entity in

*United States v. Mohammad Jawaid Aziz, et al.*

Pakistan, typically with an upcharge that would allow the co-conspirators to profit from the transaction.

38.    If the restricted Pakistani entity accepted the co-conspirators' offer, the defendants and their co-conspirators would effectuate payment for the goods and, via correspondence and communications with U.S. companies, cause the needed goods to be either exported directly to Pakistan, or transshipped to Pakistan through a third country, without export licenses, in violation of U.S. law.   At no time would the defendants or their co-conspirators reveal to the U.S. companies that the ultimate end user of the goods was a prohibited end user in Pakistan.

39.    SIDDIQUI would sometimes receive the goods at his residence in Canada, which was also the listed address for Diversified Technology Services.   He would then transship the goods to Pakistan.

40.    Through Diversified Technology Services, SIDDIQUI would often pay the U.S. companies for the goods using a credit card.   He would later receive reimbursement payments, directly or indirectly, from the restricted end users in Pakistan who were the ultimate end users of the goods.

41.    In their correspondence and communications with U.S. companies, the defendants and their co-conspirators would sometimes falsely portray that the buyer and end user of the goods was one of their front companies or another shell entity, thereby concealing that the true end user was an organization in Pakistan identified on the Entity List.

42.    The defendants and other co-conspirators sometimes transshipped goods through a front company in Singapore called GS Technology Pte Ltd to further

*United States v. Mohammad Jawaid Aziz, et al.*

conceal the that the goods were destined for prohibited end users in Pakistan.

43.    The co-conspirators would ultimately cause the goods to be shipped to Pakistan through Industrial Automation or International Trading Company. Through Industrial Automation, ▮▮▮▮▮ facilitated clearance of the goods through Pakistani customs and delivery to prohibited end user in Pakistan or one of those end users' front companies.

44.    At no time would the defendants or their co-conspirators, or their network of front companies, be the true end users or ultimate consignees of the goods exported from the U.S.  Instead, the defendants and their co-conspirators would act as procurement agents and serve as fronts for entities in Pakistan on the Entity List

45.    At no time would the defendants or their co-conspirators apply for or obtain an export license from the United States Department of Commerce authorizing the export of goods to any organization in Pakistan on the Entity List.

46.    In the course of the conspiracy the defendants and their co-conspirators caused at least the following unlicensed exports to be made from the United States:

| Shipment Date | Stated End User | Actual End User | U.S. Company | Product (ECCN) | Value |
|---|---|---|---|---|---|
| 1/30/2013 | Pan Pacific Sales | National Development Complex | U.S. Company 2 | Industrial LCD Workstations (5A002) | $2,299.00 |
| 4/1/2013 | Industrial Automation | National Development Complex | U.S. Company 3 | Thermal Conductivity Unit | $12,750.00 |
| 2/24/2014 | Unknown | Space & Upper Atmosphere Research Commission | U.S. Company 4 | Spherical Air Bearing, et al | $16,495 |

*United States v. Mohammad Jawaid Aziz, et al.*

| Shipment Date | Stated End User | Actual End User | U.S. Company | Product (ECCN) | Value |
|---|---|---|---|---|---|
| 3/6/2014 | Diversified Technology Services | National Development Complex | U.S. Company 2 | Industrial LCD Workstations (5A002) | $2,080.00 |
| 5/5/2014 | Unknown | New Auto Engineering | U.S. Company 5 | Digital Video Microscope | $6,495 |
| 7/11/2014 | International Trading Company | Space & Upper Atmosphere Research Commission | U.S. Company 6 | Centrifugal pump | $7,257.00 |
| 8/8/2014 | High Landers Scientific Systems | Khan Research Laboratories | U.S. Company 7 | Plano Laser Interferometer | $204,903.00 |
| 10/15/2014 | Unknown | Space & Upper Atmosphere Research Commission | U.S. Company 8 | Limonene pump accessories | $1,616.00 |
| 5/28/2015 | Industrial Automation | National Development Complex | U.S. Company 9 | Monitors | $13,200.00 |
| 6/18/2015 | National Mechatronics Center | Advanced Engineering Research Organization | U.S. Company 10 | Signal Generator | $13,052.00 |
| 7/25/2015 | National Mechatronics Center | Advanced Engineering Research Organization | U.S. Company 11 | Data Acquisition device (3A992) | $7,530.60 |
| 12/19/2015 | Industrial Automation | National Development Complex | U.S. Company 12 | Lux Meter Calibrator | $6,225.00 |
| 12/23/2015 | National Mechatronics Center | National Development Complex | U.S. Company 11 | Multifunction I/O device (3A992) | $19,908.00 |
| 12/24/2015 | National Mechatronics Center | National Development Complex | U.S. Company 11 | Single board real-time controller (4A994) | $5,918.17 |

*United States v. Mohammad Jawaid Aziz, et al.*

| Shipment Date | Stated End User | Actual End User | U.S. Company | Product (ECCN) | Value |
|---|---|---|---|---|---|
| 1/18/2016 (apx) | National Mechatronics Center | National Development Complex | U.S. Company 11 | Data acquisition system (3A992) (4A994) (5A991) (5A992) (5D992) | $70,577 |
| 3/25/2016 | Skytech Engineering | National Development Complex | U.S. Company 13 | Acoustic Emission System | $31,365.00 |
| 4/8/2016 | Skytech Engineering | National Development Complex | U.S. Company 14 | Machine Controller Cards (2B991) | $1,595 |
| 6/29/2016 | Skytech Corporation | National Development Complex | U.S. Company 15 | Handheld Hydrogen Detector | $7,065.00 |
| 9/29/2016 | Skytech Engineering | National Development Complex | U.S. Company 11 | Compact RIO Controller (3A992) | $75,511.00 |
| 1/3/2017 (apx) | Skytech Engineering | National Development Complex | U.S. Company 11 | PXI System/controller (3A992) | $25,871.22 |
| 1/17/2017 | Diversified Technology Services | Advanced Engineering Research Organization | U.S. Company 16 | Disc | $2,995.00 |
| 3/17/2017 | Industrial Automation | Skytech Corporation | U.S. Company 17 | Motion Controller | $3,514.50 |
| 4/4/2017 | Diversified Technology Services | National Development Complex | U.S. Company 18 | Pressure & Temperature Transducers, et al | $8,692.85 |
| 10/24/2017 | Skytech Engineering | National Development Complex | U.S. Company 13 | Acoustic Emission System (3A992) | $71,420.00 |
| 11/11/2017 | Mohammad Aziz | New Auto Engineering | U.S. Company 19 | UAV accessories | $1,922.70 |
| 1/5/2018 | International Trading Company | National Development Complex | U.S. Company 20 | Mortar | $644.44 |

*United States v. Mohammad Jawaid Aziz, et al.*

| Shipment Date | Stated End User | Actual End User | U.S. Company | Product (ECCN) | Value |
|---|---|---|---|---|---|
| 1/9/2018 | International Trading Company | National Development Complex | U.S. Company 20 | Alumina Bricks | $9,280.00 |
| 3/13/2018 | Global Communication Enterprises | National Development Complex | U.S. Company 21 | Sheet Resistance Meter | $4,060.00 |
| 4/4/2018 | Industrial Automation | National Development Complex | U.S. Company 22 | Load cell, et al | $8,850.00 |
| 4/11/2018 | GS Technology | National Development Complex | U.S. Company 23 | Ball/Roller Screw Testing Equipment | $146,400.00 |

## Overt Acts

47.    In furtherance of the conspiracy and to accomplish its objects, defendants SIDDIQUI, ▓▓▓▓▓▓▓▓▓▓, and others known and unknown to the Grand Jury, committed at least one of the following overt acts, among others, within the District of Minnesota and elsewhere:

48.    On or about January 12, 2013, an email from i_t_company@yahoo.com signed by ▓▓▓▓▓▓ was sent stating: "Enclosed are copies of registration letters of our company with PMO, KRL, and SUPARCO for your perusal. Original letters sent to AERO addressing additional Director Logistics by courier, probably it will receive by next week." Attached to the email were correspondence demonstrating the registration of International Trading Company with Khan Research Laboratories (KRL), the Pakistan Atomic Energy Commission (PAEC), and the Space and Upper Atmosphere Research Commission (SUPARCO).

49.    On or about January 20, 2014, ▓▓▓▓▓▓ sent an email from ▓▓▓▓▓▓▓▓▓▓ to SIDDIQUI at indautomation@yahoo.com and ▓▓▓▓▓▓ at

15

*United States v. Mohammad Jawaid Aziz, et al.*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with the subject line "Registration Documents HQ with Payorder." The email attached a "Registration Form" on letterhead for SUPARCO, in Karachi, Pakistan. The form provided registration information for International Trading Company and listed the nature and value of International Trading Company's business with other entities in Pakistan as follows:

| Name of Company / Organization | Number of Years | Annual Contract Volume | Approximate Value of Business (Rupees) |
|---|---|---|---|
| National Development Complex (NDC) | 17 | 22-25/yr | Rs 26 million |
| Project Management Organization (PMO) | 13 | 5-9/yr | Rs 5-6 million |
| Air Weapons Complex (AERO) | 7 | 6-8/yr | Rs 3-5 million |
| Karachi Shipyard Eng Works (KSEW) | 13 | 2-4/yr | Rs 1-2 million |
| Directorate of Technical Procurement (DTP) | 3 | 5-6/yr | Rs 2-5 million |

The form further provided the following information about International Trading Company's business with SUPARCO:

| Year of Supplies | Annual Volume | Approximate Value of Business |
|---|---|---|
| 2013 | 6-8 order/yr | Rs 9 million |
| 2012 | 8-9 order/yr | Rs 9 million |
| 2011 | 8-9 order/yr | Rs 4 million |
| 2010 | 8-9 order/yr | Rs 10 million |
| 2009 | 10-12 order/yr | Rs 18 million |

50.    The form was signed by WALEEM in the capacity of "Sales Engineer" on September 1, 2014.

51.    On or about April 20, 2016, an email was sent from i_t_company@yahoo.com, signed by ▮▮▮▮▮▮▮, to AERO in response to a purchase

*United States v. Mohammad Jawaid Aziz, et al.*

order submitted by AERO to International Trading Company:

> After careful review, we would request you to change the
> consignee. This order can not be shipped to AERO from
> USA. You may change it to our company: SKYTECH
> ENGINEERING LTD . . . . Also, as advised earlier, we will
> need a draft end use statement showing commercial
> application of this item. We will manage all other
> formalities on our company letterhead.

52.     On or about May 16, 2016, an email was sent from
i_t_company@yahoo.com to a representative of the Advanced Engineering Research
Organization (AERO). The email stated that "[p]ayment must be transferred in US
Dollars too [sic]: Diversified Technology Services" and provided the bank account
number and branch information in Surrey, British Columbia, Canada. The email
stated that "[t]he above banking information has not changed over the last 10 years.
Several orders were paid by your organization in the past three years." The email also
indicated that "[o]ur principal has been receiving payment under the same account
from other strategic organizations."

53.     On or about May 24, 2016, an email signed by          was sent from
i_t_company@yahoo.com to a person with the title "Director SEE Technical
Procuement [sic]":

> As discussed over phone with our director, please see
> attached copies of orders from NDC (they work under the
> name of Skytech Corporation).
>
> 1. Enquiries are issued to our registered and security
> cleared company (ITC).
>
> 2. P.O.'s are issued to ITC
>
> 3. To import and effect payment, LC's [Letters of Credit]
> are issued thru our company "Industrial Automation"

*United States v. Mohammad Jawaid Aziz, et al.*

> You may verify this from Director Purchase, NDC . . . . We
> have at-least 20-25 orders each year valuing more than one
> Million Dollars.

54.    On July 19, 2016, an email signed by SIDDIQUI was sent from
i_t_company@yahoo.com to a representative of the Pakistan Atomic Energy
Commission discussing a contract and a meeting between the Commission and
International Trading Company.   The email attached a letter from International
Trading Company stating:

> We are in receipt of referenced contract from your
> organization. This is the first order from your organization
> to our firm.  Prior to execution of this order, we need to
> discuss to understand your procedures.    We have
> accomplished numerous orders for KRL, NDC, PMO and
> AWC. Please arrange a meeting at the earliest to finalize
> this order.  Our representative                        ,
> has travelled from Karachi to meet with you and at attend
> a meeting at KRL.

55.    On or about October 31, 2016, an email was sent from
i_t_company@yahoo.com to indautomation@yahoo.com with no content other than an
attachment that was the BIS Entity List.

56.    On or about November 3, 2016, an email with no content other than two
attachments was sent from indautomation@yahoo.com to the same address.   One
attachment was a file named "Email Addresses and passwords.doc." That contained
a list of email accounts used by the defendants and the passwords for those accounts.
The attachment also contained account numbers and passwords for Canadian bank
accounts, including one associated with Diversified Technology Services

*United States v. Mohammad Jawaid Aziz, et al.*

      (a)    The second attachment was a file named "Addresses.docx." That file contained several different email signature blocks, many of which included names of individuals, purported individuals, or entities. The file would allow the defendants to sign emails from different entities or each other in a consistent manner and style. The file included, for example, a signature block for (1) "Jamal" at "INDUSTRIAL AUTOMATION" with an address in Karachi Pakistan, (2) "Jay" at "Diversified Technology" with an address in Surrey, British Columbia, (3) "INTERNATIONAL TRADING COMPANY" with an address in Karachi, Pakistan, and (4) "███████████" at "ITC, Karachi."

57.    On or about March 6, 2017, an email was sent from i_t_company@yahoo.com to a company in Texas from which International Trading Company and Industrial Automation had made purchases. The email stated: "This is to certify that [International Trading Company] and Industrial Automation belong to the same owners" and that "[b]oth companies are located at the same address."

58.    On or about February 9, 2018, an email was sent from i_t_company@yahoo.com to several recipients with a blind carbon copy ("BCC") to ██████████ ██ ████████████████████████ and ████████ ██ ████████████████████. The email stated "Please attached [sic]. This is the updated list issued on January 26th. Please review page 3." The attachment included a page from the Federal Register describing the ERC's determination to add an aliases and two addresses for AERO to the Entity List. The additional alias was Integrated Solutions.

*United States v. Mohammad Jawaid Aziz, et al.*

## Unlicensed Export of 24 Linear Actuators from U.S. Company 1 to the National Development Complex

59.     On or about May 30, 2018, International Trading Company received a request for quotation at the email address indautomation@yahoo.com from Global Communication Enterprises, which was a front company for Pakistan's National Development Complex, located in Islamabad, Pakistan. The request listed a "Tender No." of 575-GC-FP-05-18 and sought a price quotation for 24 linear actuator motors from US Company 1, located in Minnesota.

60.     On or about June 5, 2018, SIDDIQUI contacted U.S. Company 1 using the email address ppsincorporated@yahoo.com seeking a price quote for 24 linear actuator motors of the same model number requested by Global Communications Enterprises.

61.     On or about June 5, 2018, SIDDIQUI received a response from an employee at U.S. Company 1 quoting a total price of $4,144 for the linear actuator motors, to be paid in two installments of $2,072.

62.     On or about June 19, 2018, ▮▮▮▮▮ sent an email from ▮▮▮▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮▮▮▮▮▮▮, and Co-conspirator #1 attaching an offer from International Trading Company to Global Communication Enterprises for 24 linear actuator motors from U.S. Company 1 with reference number 575-GC-FP-05-18. The quoted price was S$12,360 (Singapore Dollars) plus S$395 for "Packing+Local Transport." The offer listed i_t_company@yahoo.com as the email address for International Trading Company. The email stated the quotation would be sent to the "Procurement Co-ordinator" at

*United States v. Mohammad Jawaid Aziz, et al.*

Global Communication Enterprises by courier that day.

63.    On or about Saturday August 11, 2018,          sent an email to indautomation@yahoo.com attaching a letter dated August 6, 2018, from Global Communication Enterprises to International Trading Company. The letter stated that International Trading Company's quotation for linear actuator motors was under review for "value Singapore $12,755.00." The letter further requested that International Trading Company "[a]llow us maximum discount" and "[s]ubmit proforma Invoice of your principal"

64.    On or about August 13, 2018,          sent an email to Co-Conspirator #1 attaching a letter from International Trading Company to "Procurement Co-ordinator" of "Global Communication Enterprises, Islamabad." The email directed Co-Conspirator #1 to "[s]end this letter in P.I to below address by Courier TODAY." The address listed was:

> MR. FAHAD
> MANAGER IMPORT
> NATIONAL DEVELOPMENT COMPLEX
> PLOT #94, H-11/4,
> OPPOSITE POLICE LINES
> ISLAMABAD

The letter referenced tender no 575-GC-FP-18 and stated, "the prices offered to you initially were the lowest possible prices." The letter stated it "[e]nclosed . . . a Proforma Invoice received from our Principal."

(a)    The Proforma Invoice was dated July 31, 2018, on letterhead for GS Technology Pte Ltd in Singapore and addressed to Industrial Automation in Karachi, Pakistan. The invoice was for 24 linear actuator motors from U.S.

*United States v. Mohammad Jawaid Aziz, et al.*

Company 1 and listed "Purchase Order" number 575-GC-FP-05-18. The price was listed as "12,360.00" Singapore dollars with S$395 for "FOB Charges," totaling S$12,755.00. Under "TERMS & CONDITION" the proforma invoice stated, "ALL ITEMS ARE SUBJECT TO APPLICABLE EXPORT LAWS AND REGULATIONS."

65.    On or about September 19, 2018, Co-conspirator #2 sent an email to indautomation@yahoo.com attaching a purchase order from Global Communications Enterprises to International Trading Company that referenced "Order No." 575-GC-FP-05-18. The purchase order stated "[w]e are please [sic] to confirm the acceptance of your Principal M/s GS Technology Pte Ltd, Singapore Proform Invoice 37106/18 dated 31-07-2018 for purchase of following items amounting to SGD12,755.00." The items for purchase were 24 linear actuator motors from U.S. company 1.

66.    On or about September 24, 2018, SIDDIQUI sent an email to U.S. Company 1 from ppsincorporated@yahoo.com stating "[w]e wish to confirm our order for Qty 24 units. Please advise how would you like to proceed." The employee from U.S. Company 1 responded on or about the same day thanking SIDDIQUI for his message but noting that "it appears that we have not received an order from you, for these items."

67.    On or about September 24, 2018, SIDDIQUI sent a reply email from ppsincorporated@yahoo.com to U.S. Company 1 stating "[i]f there is a need for a written P.O., let me know. I will call you tomorrow to give you credit card details."

68.    On or about September 25, the employee from U.S. company 1 replied to SIDDIQUI and asked him to send a purchase order. The employee stated that U.S.

*United States v. Mohammad Jawaid Aziz, et al.*

Company 1 was "in the Process of obtaining ISO 9001 Certification" and would be "requiring more detailed documentation, including 'official' Purchase Orders."

69.     On or about September 26, 2018, SIDDIQUI responded by email to U.S. Company 1 attaching a purchase order and stating "[p]lease process our order." The purchase order was dated September 25, 2018, on letterhead for Pan Pacific Sales, Inc., in Seattle, WA, and addressed to U.S. Company 1. The purchase order was for 24 linear actuators from U.S. company and listed "P.O#575-GC-FP-18." The "Place of Destination" was "Surrey, BC, Canada," and the "Consignee" was Diversified Technology Services in Surrey, British Columbia. The purchase order stated the terms of payment as "50% advance (US $2072.00) balance 50% (US $2072.00) at the time of delivery" and listed the delivery date as December 15, 2018. It provided for a unit price of $172.66 for each linear actuator, totaling $4,143.84. The purchase order also indicated a warranty period of 1 year "[f]rom the date of receipt at buyer's premises."

70.     On or about September 26, 2018, the employee from U.S. Company 1 sent an email to SIDDIQUI about a "math error" in the price calculation and stating that the quoted price was $259 per unit. SIDDIQUI replied on or about the same day stating "[w]e understand we get 20% discount on $259.00 each." The U.S. Company 1 employee responded on or about the same day: "No, Sir, we did not make that offer. Please review the quote. There is no mention of a 20% discount. The Quote clearly states that the price to you is $259 Each."

71.     SIDDIQUI spoke to the employee of U.S. Company 1 via telephone on or about September 26, 2018. During the telephone conversation, SIDDIQUI agreed to

*United States v. Mohammad Jawaid Aziz, et al.*

a total purchase price of $5,520 to be paid in two installments of $2,760. The employee of U.S Company 1 indicated that he could not provide a one-year warranty without specific knowledge of the application for the linear actuators. SIDDIQUI stated he believed his customers had already used the specific linear actuators and the warranty provision in the purchase order could be removed.

72.    During the phone call with the employee of U.S. Company 1, SIDDIQUI provided a credit card number ending with the number 1278 for payment. U.S. Company 1 charged the credit card $2,760, which was 50 percent of the total purchase amount.

73.    On or about September 27, 2018, SIDDIQUI sent an email attaching a revised purchase order to U.S. Company 1. The revised purchase order was on letterhead for Pan Pacific Sales, Inc., in Seattle, Washington. The email stated, "Revised P.O. as per our phone conversation attached." The revised purchase order was dated September 25, 2018, referenced "P.O. # 575-GC-FP-05-18, Linear Actuator," stated the terms of payment as "50% advance (US $2760.00) balance 50% (US $2760.00) at the time of delivery," listed a delivery date of December 15, 2018, and did not provide for a warranty. The purchase order stated the "Place of Destination" as "Surrey, BC, Canada" and the Consignee as Diversified Technology Services in Surrey, British Columbia.

74.    SIDDIQUI exchanged emails with the employee of U.S. Company 1 from on or about December 7, 2018, to December 18, 2018, regarding the status of the order and settling issues related to charging the shipping costs to Diversified Technology Service's account with a shipping company. On or about December 18, 2018, the

*United States v. Mohammad Jawaid Aziz, et al.*

employee of U.S. company indicated that "[t]he long awaited delivery is happening" and that SIDDIQUI's credit card had been charged for the shipping costs and the final installment of $2,760. The employee of U.S. Company 1 provided a new point of contact for SIDDIQUI to interface within the future. Unbeknownst to SIDDIQUI, the new point of contact was an undercover government agent posing as an employee of U.S. Company 1 (the "Undercover Employee of U.S. Company 1").

75.    On or about December 19, 2018, SIDDIQUI sent an email to U.S. Company 1 asking for the shipping company's tracking number.

76.    On December 20, 2018, SIDDIQUI received an email from the Undercover Employee of U.S. Company 1 providing the tracking number and stating that, according to the tracking information, SIDDIQUI should receive shipment by December 28, 2018.

77.    On or about December 30, 2018, SIDDIQUI sent an email to U.S. Company 1: "Our order was not delivered on 28th. I called [the shipping company] and was advised that they need more information/documents from shipper to export the order. After 5 days usually UPS returns the goods to shipper. Please contact UPS to sort out this situation."

78.    On or about January 2, 2019, SIDDIQUI received an email from the Undercover Employee of U.S. Company 1 stating that, based on conversations with the shipping company, the shipment was delayed "due to a government agency hold; probably Customs." The point of contact for U.S. Company 1 stated he would reach out to "our local Customs office" to gather further information.

*United States v. Mohammad Jawaid Aziz, et al.*

79.    SIDDIQUI received further emails from the Undercover Employee of U.S. Company 1 on or about January 3, 2019, and January 9, 2019, describing issues getting information from U.S. Customs and Border Patrol due to a government shutdown.  On or about January 9, 2019, the Undercover Employee of U.S. Company 1 stated "I try not to push Customs too much because they can make it really tough to get shipments out and I don't want any additional scrutiny."

80.    On or about January 9, 2019, SIDDIQUI responded to the point of contact at U.S. company 1: "You are correct.  Don't push."

81.    On or about January 15, 2019, SIDDIQUI received an email from the Undercover Employee of U.S. Company 1 indicating that he had spoken to Customs and Border Protection, which indicated that "the property is being seized, although I'm not sure why."  The Undercover Employee indicated that Customs and Border Protections would send out seizure notices.

82.    On or about January 16, 2019, SIDDIQUI received an email from the Undercover Employee U.S. Company 1 indicated that he had received the seizure notice, but that "other than several legal citations, it doesn't state why the actuators were seized."  The Undercover Employee of U.S. Company 1 described the available options in the seizure notice and noted that the notice mentioned "smuggling and export contrary to law."

83.    On or about January 16, 2019, SIDDIQUI sent an email to the Undercover Employee of U.S. Company 1: "OK, we can discuss.  Please advise if these are No License required items or need export licenses."

*United States v. Mohammad Jawaid Aziz, et al.*

84.    On or about January 16, 2019, SIDDIQUI sent an email to the Undercover Employee of U.S. Company 1: "Get it released to your company. We have no experience of handling such a situation."

85.    On or about January 18, 2019, SIDDIQUI received an email from the Undercover Employee of U.S. Company 1 stating that he was "confident that these items are classified as EAR99 and therefore do not require a license to go to Canada." The Undercover Employee of U.S. Company 1 indicated he would "file a license determination with [the Department of] Commerce" to facilitate discussions with U.S. Customs.

86.    On or about January 18, 2019, SIDDIQUI sent an email to the Undercover Employee of U.S. Company 1: "The only thing I can think of is Shipper's Export Declaration Form (SED). I believe that you as a shipper did not submit this form with the shipment. This is why they treat this as smuggling of goods."

87.    On or about February 14, 2019, SIDDIQUI sent an email to the Undercover Employee of U.S. Company 1: "The consignee in Canada, Diversified Technology has received the seizure notice. I understand that you are handling at your end so they do not need to apply for remission. Please confirm."

88.    On or about March 5, 2019, SIDDIQUI sent an email to the Undercover Employee of U.S. Company 1: "Please obtain export classification of this item. We do not want you to ship this item to us until we have a confirmed classification. I hope you understand my point."

89.    On or about March 14, 2019, SIDDIQUI received an email from the Undercover Employee of U.S. Company 1 stating "[t]he items is EAR99" and asking

*United States v. Mohammad Jawaid Aziz, et al.*

"[w]hat was Diversified's intended application?"

90.    On or about March 18, 2019, SIDDIQUI sent an email to the Undercover Employee of U.S. Company 1 stating: "They have a commercial application. They have cancelled the order now due this [sic] delay. Please keep the items with you once released. We may find another customer."

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
[50 U.S.C. § 4819(a) and (b) – Violations of the Export Control Reform Act of 2018]

91.    The allegations in paragraphs 1-90 of this Indictment are realleged and incorporated herein.

92.    In or around May 2018 through in or around March 2019, the defendants:

**MOHAMMAD JAWAID AZIZ,**
**a/k/a "Jawaid Aziz Siddiqui",**
**a/k/a "Jay Siddiqui",**

in the District of Minnesota and elsewhere, knowingly and willfully exported and caused to be exported, and attempted to export and cause to be exported, linear actuator motors from the United States to an entity in Pakistan on the Department of Commerce's Entity List, without having first obtained the required license from the Department of Commerce.

All in violation of Title 50, United States Code, Section 4819(a)(1), 4819(a)(2)(A)-(G), and 4819(b); Title 15, Code of Federal Regulations, Sections 736.2(b)(5) and 764.2; and Title 18, United States Code, Section 2.

*United States v. Mohammad Jawaid Aziz, et al.*

## FORFEITURE ALLEGATION

93.    The Grand Jury realleges and incorporates the allegations of Counts One or Two of this Indictment, which are incorporated by reference as though fully set forth herein.

94.    Upon conviction of Counts 1 or 2 of this Indictment, the defendant(s) shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violations of Title 50, United States Code, Section 1705.

95.    Upon conviction of Counts 1 or 2 of this Indictment, the defendant(s) shall forfeit to the United States pursuant to Title 50, United States Code, Section 4819(d)(1)(A) and (B), any of the person's property which constitutes or is traceable to the gross proceeds taken, obtained, or retained, in connection with or as a result of the violation of Title 50, United States Code, Section 4819, and any of the person's property which was used or intended to be used, in any manner, to commit or facilitate the violation.

96.    If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

### A TRUE BILL

_____    _____
ACTING UNITED STATES ATTORNEY        FOREPERSON

29