UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MOHAMMAD JAWAID AZIZ,

Defendant.

Case No. 25-CR-66 (PJS-DJF)

**DEFENDANT'S POSITION REGARDING SENTENCING**

Mohammad Aziz, by and through his undersigned attorneys, respectfully submits the following position with respect to sentencing. Aziz has been held in custody since March 21, 2025. His case concerns the sale of dual-use items, mostly industrial and manufacturing equipment, to prohibited end-users in Pakistan. This was not his primary occupation, which was running a printing business in Canada.

On September 2, 2025, Aziz pled guilty to the charged offense, and took full responsibility for his actions. At every step of the process since his arrest, Aziz has been fully cooperative with authorities and has acknowledged he engaged in multiple transactions in knowing violation of United States law. These illegal transactions ended in 2018.

The circumstances of Aziz's offense, and the nature and characteristics of Aziz himself, merit a significant downward departure from the guidelines range of 37 to 46 months: Mohammad Aziz is elderly, in poor health, and had retired from the procurement

business in early 2019, long before the criminal charges in this case were brought. There is no indication that he will reoffend and every indication that he has already been punished after a lengthy amount of hard time confined in the Sherburne County Jail, a facility that primarily houses young gun and drug offenders. For these reasons, the Court should sentence Aziz to one year and one day. This would be sufficient but not greater than necessary to effectuate the goals articulated in 18 U.S. Code § 3553.

**RELEVANT FACTS**

The Department of Commerce imposes restrictions on the export of "dual use" items to certain state and quasi-state organizations that assist the Pakistani weapons program. (Doc. 49, ¶ 8). An item is "dual use" if it has both peaceful and military applications. *See* 15 CFR § 730.3 (defining "dual use" under the Export Administration Regulations). Examples of dual-use items include portable electric generators, welding equipment, and certain high-resolution cameras. *See, e.g., Revisions to the Export Administration Regulations (EAR) To Make the Commerce Control List (CCL) Clearer***,** 15 Fed. Reg. 734, 738, 740, 742, 748, 750, 772, and 774 (October 4, 2013); *see also Revision of License Requirements of Certain Cameras, Systems, or Related Components*, 89 Fed. Reg. 13590 (Feb. 23, 2024).

From 2003 to 2019, Aziz, a resident and citizen of Canada, acted as part of a supply chain that procured dual-use goods for "denied entities" in Pakistan from suppliers in the United States. (Doc. 49, ¶ 13). Aziz assisted his co-conspirators in Pakistan by contacting suppliers in the United States, and obtaining price quotes, or by carrying out the entire order. *Id.* At all times, Aziz was fully aware that his co-conspirators were

doing business with entities in Pakistan that U.S. suppliers were not allowed to export goods to, and in no case did Aziz tell the suppliers that the ultimate end-users of these goods were denied entities in Pakistan. *Id.*

Aziz's indictment specifically details 25 transactions spanning 5 years, from 2013 to 2018, and describes an additional transaction involving linear actuator motors in even more detail. (Doc. 12, ¶ 46 & ¶¶59-90). As discussed in more detail *infra,* most of Aziz's transactions were for industrial and manufacturing equipment, and in no case did Aziz sell weapons or equipment that had an exclusively military purpose.

To carry out his work, Aziz used a Canadian company he created called Diversified Technology Services (DTS) which was based in Surrey, British Columbia. (Doc. 12, ¶ 36). When Aziz's co-conspirators received requests for price quotes or purchase orders from denied entities in Pakistan, Aziz would reach out to distributors in the United States to obtain competitive price quotes. On a few occasions, Aziz used the letterhead of a company he helped found in the early 2000s called Pan-Pacific Sales ("PPS") to carry out these transactions. (Doc 49, ¶ 9 and fn. 3). Aziz had no actual authority to do this and did not own or operate PPS at any time relevant to his present case. *Id.*

Aziz was completely retired from this line of work by the first part of 2019, and DTS was closed in 2019. There is no allegation he continued to work as part of the supply chain moving prohibited goods to Pakistan after this date. In the early part of 2025, Aziz was contacted in Canada by U.S. Immigration and Customs authorities and told that he was allowed to enter the United States. He was told to report to any border

checkpoint to re-enter the country. Aziz entered in the Western District of Washington and was arrested. The Government formally moved for his detention on March 21, 2025. Since that time, Aziz has been held in various federal holding facilities, and has spent the bulk of his time (since April 19, 2025) at the Sherburne County Jail in Minnesota.

**RELEVANT LAW**

Pursuant to the United States Sentencing Guidelines and the Supreme Court's decision in *Gall v. United States*, 552 U.S. 38, 49, (2007) a sentencing court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." The court should then impose a sentence based on "an individualized assessment based on the facts presented." *Id.* at 50.

In performing this assessment, the Court considers the circumstances, and the physical and mental condition, of the defendant before the Court. The 8th Circuit has rejected, outright, a rule that demanded "extraordinary circumstances to justify a sentence outside the Guidelines range." *United States v. Thorne*, 896 F.3d 861, 866 (8th Cir. 2018). The 8th Circuit similarly rejects a rule that a court must use any kind of "rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* After all, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

Instead, when determining a reasonable sentence, the Court must consult the sentencing factors outlined in 18 U.S.C. § 3553(a) to arrive at a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." Those purposes include:

> [T]he need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining a reasonable sentence under these factors, a court may, indeed must, consider the full scope of the defendant's history and character. *United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007). In doing so, a court may vary downward from the recommendation contained in the U.S. Sentencing Guidelines. In addition, "[f]actors that contribute to a low criminal history score or offense level may also weigh into a downward variance—just as aggravating factors already accounted for in a guidelines range may weigh into an upward variance." *United States v. Davis*, 20 F.4th 1217, 1221 (8th Cir. 2021).

## ARGUMENT

### I. The Nature and Circumstances of the Offense

Mohammad Aziz fully admits that he participated in a scheme to assist co-conspirators in Pakistan with the acquisition of supplies and equipment which he knew would ultimately be used by denied entities. He acknowledges this is a serious crime.

However, to properly sentence Aziz, it is important to properly contextualize the orders that Aziz helped fill for these denied entities, and his limited role in their operations.

Using DTS and other companies, Aziz procured industrial equipment for these denied entities: there is no accusation he obtained weapons, destructive devices, or goods that were inherently dangerous. The Indictment and PSR describe 30 transactions, one in extreme detail. (*See* Doc. 12, ¶ 36; *See also* Doc. 49, ¶14). The total value of these orders, over 7 years, is approximately $790,000. Usually, the gross profit on these orders was between 9-15%. Assuming a maximum markup of 15%, the gross profit on these orders comes to at most $120,000 in seven years. Most of these transactions involved industrial or manufacturing components.

For example, many items described in the Indictment and PSR are simply unsophisticated displays and sensors. The table in the indictment and PSR describes two instances where Aziz assisted in the purchase of Industrial LCD workstations, a situation in which he purchased "monitors", a "multifunction input/output device", two instances when he purchased "acoustic emission systems" (which are devices most commonly used for detecting wear-and-tear in everything from bridges to spot-welds)[1], and several transactions where he procured load cells and pressure sensors, which are widely used in industrial equipment. The table also includes a limonene pump, a device generally used to disperse limonene, an industrial cleaner and degreaser.[2]

---

[1] *See Nondestructive Evaluation Techniques: Acoustic Emission Testing,* NDE-ed.org, (available online at https://www.nde-ed.org/NDETechniques/AcousticEmission/AE_Applications.xhtml).

[2] *See product description for D-Limonene Transfer Pumps - DL Series,* AlscoPlastics.com (available online at https://alscoplastics.com/products/d-limonene-transfer-pumps-dl-series).

Additionally, many of the goods Aziz helped procure are simple industrial goods. The best example of this is the most detailed transaction listed in the indictment, the purchase of "linear actuators" from a Minnesota company in May of 2018. (Doc. 12, ¶ ¶ 59-90). These devices are electric motors that push an object in a straight line. The units purchased by Aziz retailed for about $250 apiece and he paid a total price of $5,520 for 24 of them. A copy of the specifications for a similar model from the same Minnesota company has been attached to this sentencing position as Exhibit A: the motor in question is a 24-volt model that applies a maximum of about 52 pounds of force and is rated for a recommended duty of about 25% of its maximum capacity: the devices therefore are designed to move a weight of about 13 pounds forward and backward in a line. Such devices would not be out of place on a sliding glass door or in a garage.

It is also important for the Court to understand Aziz's limited role in the supply chain for many of these items. Aziz very often acted only as a broker or social intermediary, not a direct purchasing agent. This is true for two of the most sophisticated and expensive items described in Aziz's indictment and PSR: The "Plano Laser Interferometer" and the "Ball/Roller Screw testing equipment", these are the only two orders of more than $100,000 Aziz is alleged to have helped fulfill. Many other orders are only for a few thousand dollars.

In the case of the Plano Laser Interferometer, it is submitted that Aziz's role was simply to locate an American seller, and connect them directly with a Pakistani purchaser ("Highlander Scientific Systems"). The seller quoted a price that was directly accepted

by the purchaser, and the purchaser made the full payment to the seller. Aziz did not directly help ship or handle these items.

In the case of the screw testing equipment, it is submitted that Aziz's role was again merely to connect a US-based supplier with a Pakistani purchaser. The seller, in the United States, knew full well that the testing equipment in question was being sold to purchasers in Pakistan and arranged to train the buyers on the use of the testing equipment. Aziz's role was merely to connect the buyer and the seller.

None of this is to minimize Aziz's role in a Pakistani operation to procure items for ultimate use by denied entities. Aziz acknowledges he committed a crime, nevertheless, it is important to properly contextualize the items Aziz purchased: his role was primarily to obtain dual-use equipment, mostly sensors and industrial equipment, and he often acted only as a connector.

The Court should consider, as well, that Aziz also helped procure legitimate products for purchasers in Pakistan that helped develop and improve the country. One important university project was an $800,000 project for establishing six laboratories at the Institute of Business Administration (IBA) in the city of Sukkur, Pakistan. Aziz arranged installation, commissioning, training and operation of laboratory devices purchased from a U.S. Company. The labs Aziz helped establish are used by students pursuing M.S. programs and PHD research work in mechanical, electrical and electronics engineering. These labs are fully functional, and students directly benefit from this facility.

Finally, Aziz wishes to clarify for the Court that the values described in his PSR for several tables are in denominations of Pakistani Rupees (see Doc. 49, ¶ 14, table 2 and 3). Thus, while line 1 of Table 3 of paragraph 14 of his PSR describes "9 million" rupees of annual business with SUPARCO, the conversion rate of Pakistani Rupees to U.S. Dollars in 2013 was roughly 100 to 1. So, this amounts to approximately $90,000 in annual business with SUPARCO in 2013. The value of these transactions does not have an impact on Aziz's guidelines sentence but it is important for the Court to know the value of these transactions.

**II. The History and Characteristics of the Defendant**

Aziz got into this line of work because of his father, who did procurement for the same agencies before it was illegal to do so. Aziz simply continued his father's work. Also, importantly, Aziz' acceptance of responsibility statement and his PSR make it clear that he had long ago renounced this line of work when he was arrested. Neither the indictment nor the PSR have any allegation of illicit procurement of goods for denied entities after the end of 2018. This alone would justify a downward departure on the basis of personal deterrence: Aziz himself needs no further deterrence, as he already voluntarily renounced his criminal behavior. *See United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008) (upholding a downward departure where part of the district court's basis was that defendant had closed his business and moved on from a criminal enterprise).

Additionally, prior to sentencing, Aziz will submit a letter from Shamim Ansari, a long-time employee of Aziz, as well as Tony de Souza, a long-time customer of Aziz's

print shop. These letters describe him as humble and hardworking, and honest and respectful to his employees. They further demonstrate that Aziz ran a legitimate business (a print shop) which supports not only Aziz's family but the entire neighborhood where the print shop operates. The Court will also receive a letter from defense attorney Manvir Atwal, which describes the help and personal counseling that Aziz has provided to one of her clients, a man who was formerly committed to working for ISIS against the United States. Aziz' help to Ms. Atwal's client has effectively deradicalized him, which has prevented him from wasting his life, and potentially protected American lives. Both these letters demonstrate that Aziz is an honorable and caring individual who takes seriously the felony conviction he now faces, and the considerable length of time he has already spent in a federal detention facility. This is further demonstrated by Aziz's criminal record. Aziz's PSR correctly notes that this is Aziz's "first federal conviction and first known conviction of any kind." (Doc. 49, ¶ 85).

The Court will also receive letters from Aziz's family, which reflect concerns also mentioned in Aziz's PSR. Prior to his arrest, Aziz was the sole caregiver to his wife, Farhat Jawaid, who lives in Canada. His children all live in the United States, working legally in the technology industry. Farhat suffered a stroke in 2022 and has significant home care needs which Aziz is the person in the best position to provide. (Doc. 49, ¶ 44). Aziz's entire family has struggled in his absence to care for Farhat. (Doc. 49, ¶ 45). The Court will also receive two letters describing the difficult situation Aziz's family is in due to his caregiving responsibilities. The first is from Javed Akhtar, a physician and Aziz's brother-in-law. The letter describes in detail the physical and emotional care Aziz

provides to his wife, everything from "cooking and feeding and transportation" to regularly monitoring her medications and food intake, to abating serious injuries such as "life-threatening situations like falls, dizziness, collapse and loss of consciousness" which might otherwise occur with a stroke patient. The second letter is from Dr. Mahmood Arshad, the family physician for Farhat. This letter likewise stresses that Farhat "requires assistance with household tasks, medication, management, and some personal care activities" and reiterates that Aziz's "ongoing presence and care are integral to her well-being and functional stability."

The Court should consider Aziz's role as a caregiver to Farhat in fashioning a sentence for Aziz, as this merits a considerable downward departure. *See United States v. Bueno*, 549 F.3d 1176, 1182 (8th Cir. 2008) (affirming downward departure because defendant was primary caregiver to an ailing wife); *See also United States v. Spero*, 382 F.3d 803, 804 (8th Cir. 2004) ("Exceptional family circumstances, while ordinarily not relevant for guideline purposes…can form the basis for a downward departure if they are deemed exceptional").

Finally, in fashioning a sentence, the Court should give considerable thought to Aziz's own age and health conditions. The PSR notes that Aziz's family have concerns about his physical and mental health in a prison sentence due to his advanced age. (Doc. 49, ¶ 45). Aziz is 68 and will be 69 on July 10, 2026. On the day of his sentencing he will have spent 9 months and 15 days in a federal holding facility which is far more punitive than a minimum security prison. There are no windows or outdoor spaces at the Sherburne County Jail, and in-person contact visits are not allowed. Most of Aziz' fellow

inmates are there for violent crimes and drug offenses. This incarceration would be difficult for anyone, but is significantly punishing for a 68-year-old man. When initially arrested Aziz weighed 180 pounds, he presently weighs under 140. Aziz is presently being treated for high cholesterol and type II diabetes, and requires medications for both, he is also prescribed Jardiance and Bisoprolol for a significant heart condition. (Doc. 49, ¶ 48). He has asthma, an enlarged prostate, and glaucoma in both eyes.

The Court will receive a letter from one of Aziz's physicians describing his health. The fact is that for someone of Aziz's advanced age and deteriorating physical condition, a lengthy prison sentence would fall more harshly on him than it would a younger defendant.

Aziz's advanced age also means he is unlikely to reoffend. Studies by the Federal Sentencing Commission "have repeatedly demonstrated an inverse relationship between age and recidivism: as an offender's age at sentencing increased, the rate of a later rearrest decreased." Furthermore, re-offenses among older offenders are consistently "less serious, compared to younger offenders." U.S. Sent'g Comm'n, Older Offenders in the Federal System 14 (July 2022). *See also* U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 9 (Dec. 2017).

## III. The Societal Need for the Sentence Imposed

Both the 8th Circuit and the US Supreme Court have observed that a sentencing court must be mindful of sentencing disparities between defendants accused of the same crime. Thus, in considering the societal need for the sentence imposed, this Court should consider sentencing disparities among defendants who are "'similarly situated' to each

other." *United States v. Sandoval-Sianuqui*, 632 F.3d 438, 444 (8th Cir. 2011). The basic statutory goal of the United States Sentencing Guidelines is to minimize these disparities. *United States v. Booker*, 543 U.S. 220, 223 (2005) ("basic statutory goal" of the sentencing guidelines is "diminishing sentencing disparity").

Aziz's presentence report makes it clear that the average *and* median length of imprisonment for defendants sentenced under USSG §2M5.1 ("Evasion of Export Controls; Financial Transactions with Countries Supporting International Terrorism") was 12 months. This sample includes only defendants who did not "receive[] a USSG §5K1.1 substantial assistance departure." Thus, Aziz is asking for a (slightly) longer sentence than a typical defendant accused of this crime, because he acknowledges that he acted as one participant in a scheme. That said, a sentence much higher than the median or average of 12 months would be an unjust disparity.

**CONCLUSION**

For all these reasons, a sentence of one year and one day would be sufficient but not greater than necessary to effectuate the goals articulated in 18 U.S. Code § 3

Dated: December 26, 2025

Respectfully submitted,

*/s/ William J. Mauzy*

William J. Mauzy (#68974)
William R. Dooling (#0402244)
Mauzy Law Office, PA
650 Third Avenue South
Suite 260
Minneapolis, MN 55402
(612) 340-9108
wmauzy@mauzylawfirm.com
wdooling@mauzylawfirm.com

*Attorneys for Defendant*